UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Ameriswiss Technology, LLC

   v.                                            Civil No. 11-cv-148-LM

Midway Line of Illinois, Inc.


**O R D E R**

On January 27, 2012, the clerk of the court entered a default against Midway Line of Illinois, Inc. ("Midway") on a claim brought against it by Ameriswiss Technology, LLC ("Ameriswiss"), under the federal Carmack Amendment, 49 U.S.C. § 14706. That claim arises from a traffic accident in which thirteen machines that Midway was transporting for Ameriswiss were "damaged beyond repair." Compl. (doc. no. 1) ¶ 23. Before the court is Ameriswiss's motion for entry of judgment pursuant to Rule 55(b)(2) of the Federal Rules of Civil Procedure ("Federal Rules"). In its motion, Ameriswiss asks the court to enter final judgment in its favor, against Midway, in the amount of $545,000. For the reasons that follow, Ameriswiss's motion is granted in part.

**Discussion**

By failing to respond to Ameriswiss's complaint as required by the Federal Rules, Midway has defaulted on Ameriswiss's Carmack Amendment claim. Ameriswiss is entitled to a default

judgment as to liability given that its machines were delivered to Midway in good condition and were damaged while being transported by Midway.  See Camar Corp. v. Preston Trucking Co., 221 F.3d 271, 274 (1st Cir. 2000) (setting out elements of Carmack Amendment claim).  When a motor carrier is liable for damaging a shipper's goods, the shipper is entitled to recover "the actual loss or injury to [its] property."  49 U.S.C. 14706(a)(1).  The issue here is the amount of Ameriswiss's actual loss.

"Within the meaning of the Carmack Amendment, 'actual loss or injury to . . . property' is ordinarily measured by the reduction in market value at destination or by replacement or repair costs occasioned by the harm."  Camar, 221 F.3d at 277 (citing Fredette v. Allied Van Lines, Inc., 66 F.3d 369, 372 (1st Cir. 1995)).  "Although mathematical precision is not required . . . a damages award must have a 'rational basis in the evidence.'"  Camar, 221 F.3d at 279 (quoting Thermo Electron Corp. v. Schiavone Constr. Co., 958 F.2d 1158, 1166 (1st Cir. 1992); citing Jay Edwards, Inc. v. N.E. Toyota Distrib., Inc., 708 F.2d 814, 819 (1st Cir. 1983)).  In other words, an award of damages must be based on more than speculation.  See Camar, 221 F.3d at 277.

Here, the evidence of the market value of the machines that Midway damaged is two-fold.  First, it is undisputed that on

September 20, 2010, less than a month before the accident that gave rise to Midway's liability, Ameriswiss paid $44,800 for thirteen machines,[1] including eleven used Model D6 Escomatic screw machines that were between twenty and thirty years old. Second, Ameriswiss has submitted an affidavit from one of its members (Paul Luscher) and an affidavit from an appraiser (Steven Beck), both stating that Ameriswiss's D6 Escomatics were worth $545,000. Those affidavits are supported by Beck's appraisal report which states that if Ameriswiss's eleven D6s had not been damaged, they would have had a fair market value of $545,000 as of April 4, 2012.[2]

Beck's report, however, says little of substance about how he determined the value of the damaged D6s. To be fair, the report indicates that Beck viewed photographs of them, "conducted an investigation into the market conditions for this type of equipment," and "consulted with several new and used machinery dealerships as well as reports and periodicals." Pl.'s Mot. for Entry of J., Ex. B (doc. no. 59-2), at 3. But, the report does not indicate what Beck learned from those sources that led him to determine the values of Ameriswiss's

---

[1] That price consisted of $40,000 for the previous owner of the machines plus a twelve-percent commission for the auctioneer who handled their sale.

[2] Without any readily apparent explanation, Beck valued ten of the D6s at $50,000 apiece, while assigning a value of $45,000 to the other one.

D6s. More specifically, the report includes no information about either attempted or completed sales of comparable machines.

As between the $44,800 Ameriswiss paid for the machines shortly before they were damaged and the $545,000 that Beck says they were worth, the court concludes that their fair market value is no more than $44,800. Beck's report defines fair market value as:

> [a] professional opinion of the estimated most profitable price . . . to be realized for property in an exchange between a willing buyer and a willing seller, with equity to both, neither being under any compulsion to buy or sell, and both parties fully aware of all relevant facts, as of the effective date of this appraisal report.

Pl.'s Mot. for Entry of J., Ex. B (doc. no. 59-2), at 4. Beck's professional opinion is that the machines had a fair market value of $545,000. But his report identifies no evidence supporting that opinion such as the prices asked by other willing sellers for similar equipment or the prices paid by other willing buyers. The fact that Beck's report mentions no other sales of used D6s from the 1980s suggests that sales of machines such as the ones Midway damaged occur infrequently enough to make any opinion concerning their market value inherently speculative. See Camar, 221 F.3d at 278 (pointing out, in connection with claim for lost profits, difference between markets for fungible new goods and markets for used

goods). But, of course, the record <u>does</u> include evidence of one sale of used Escomatic D6 screw machines involving a willing buyer and a willing seller: Ameriswiss's purchase of the machines that Midway damaged, for $44,800.[3]

While the court has found no case that is directly on point, the First Circuit's opinion in Camar offers useful guidance as to the kind of evidence necessary to support an award of damages under the Carmack Amendment. In Camar, the plaintiff shipper was a company that, like Ameriswiss, bought used equipment and refurbished it for resale. <u>See</u> 221 F.3d at 273. In August of 1995, Camar purchased 156 pieces of "used marine equipment located at a naval depot in California," <u>id.</u>, "from the United States Navy's Defense Reutilization and Marketing Service ('DRMS')," <u>id.</u> The "Navy had originally paid $275,000 to acquire the equipment," <u>id.</u>, but sold it to Camar for $215, <u>id.</u> Camar then contracted with Preston to transport its newly acquired equipment. <u>Id.</u> After Preston lost Camar's

---

[3] In response to the summary judgment motion filed by former defendant C.H. Robinson Worldwide, Inc., Ameriswiss produced evidence that it was prepared to offer $200,000 for the equipment Midway later damaged, and that Paul Luscher was surprised that the auctioneer accepted his offer of $40,000. <u>See</u> Mem. of Law (doc. no. 49-1), at 6. But, as in Camar, "[t]he low price for which [Ameriswiss] obtained the equipment suggests . . . that in the eyes of the seller and of other [potential purchasers] the market for it remained quite questionable and uncertain." 221 F.3d at 278. That is, Luscher may believe he got a great deal on the D6s, but there is no objective evidence from the marketplace to corroborate his belief.

5

goods, "Camar submitted a loss claim to Preston of $137,500."
Id.  When Preston did not pay that claim, Camar sued for
$137,500, and later "amended its complaint to allege damages of
$353,370, claiming it could have sold the equipment for [that]
sum."  Id.

At summary judgment, Camar contended that [its] actual loss
should be measured by what foreign buyers had previously paid
[it] for similar items."  Camar, 221 F.3d at 273-74.  Regarding
the legal aspect of Camar's argument, i.e., the correct measure
of damages, the court of appeals held that the Carmack Amendment
"permits recovery of lost profits unless they are speculative."
Id. at 277 (citing Pillsbury Co. v. Ill. Cent. Gulf R.R., 687
F.2d 241, 245-46 (8th Cir. 1982); Hector Martinez & Co. v. S.
Pac. Transp. Co., 606 F.2d 106, 108 (5th Cir. 1979); Polaroid
Corp. v. Schuster's Express, Inc., 484 F.2d 349, 351 (1st Cir.
1973)).

The court of appeals then described Camar's attempt to
prove its lost profits in the trial court:

> To establish the dollar value of its loss, Camar
> submitted exhibits describing each type of lost
> equipment and comprising the record of its procurement
> and of Camar's previous sales of similar equipment to
> foreign buyers.  For example, one exhibit includes a
> statement as follows:
>
>> This is a bearing turbine, similar to the four
>> lost by Preston Trucking . . . .  On July 21,
>> 1995 Camar sold one of these to the Brazilian
>> Navy for $59,830.  If the goods had been

6

> delivered and Camar had been able to sell the
> missing four at that price, Camar would have
> earned $239,320 on the four bearing turbines
> Preston lost.
>
> Procurement history data, including the identity of
> the vendor and the price paid by the U.S. government,
> follow.  Next are invoices and other documents
> reflecting the sale of the allegedly similar equipment
> to the Brazilian Navy.  The other exhibits are
> similar, except as to two categories of equipment in
> which the damages calculations are based solely on the
> procurement history.

Id. at 277.  In the face of the foregoing evidence, including the price Camar received for a turbine the month before it purchased four similar turbines that Preston lost, "[t]he district court determined that the $215 Camar paid for the equipment was its value for purposes of ascertaining Camar's actual loss and that the evidence as to lost profits was too speculative."  Id. at 276-77.  The court of appeals agreed "that the evidence of past sales on this record is too speculative to form the basis of a damages award greater than the $215 purchase price."  Id. at 277.  The court continued:

> Camar's evidence did not identify any prospective
> purchasers for the lost used equipment at prices like
> those paid for the previously sold equipment, or,
> indeed, at any price.  In his deposition testimony,
> Camar's president, James Mercanti, admitted that Camar
> had no customer for the equipment at the time of the
> bid or at the time Preston lost the shipment.  No
> evidence of subsequent customer demand was submitted.

Id.  As the court of appeals explained, "we think the district court did not err in concluding that '[t]he DRMS Notice of Award

7

indicating Camar's purchase price of $215 is the only non-speculative evidence of the market value of the lost equipment." Id. at 278.

Here, the evidence concerning the fair market value of Ameriswiss's eleven used D6s is even less substantial than the evidence of lost profits the court held to be insufficient in Camar.[4] In Camar, the plaintiff produced evidence of recent sales of equipment similar to the equipment lost by the trucking company. Here, there is no evidence of any sales of equipment comparable to the machines that Midway damaged. Unsupported by such evidence, Beck's opinion, while rendered by an expert in the field, cannot be regarded as anything more than well-informed speculation about a "market [that is] quite questionable and uncertain," Camar, 221 F.3d at 278. Thus, the price Ameriswiss paid for the equipment that Midway damaged is the only non-speculative evidence of the market value of that equipment.

Having determined that Ameriswiss's adequately supported damages do not exceed the $44,800 it paid for the equipment that

---

[4] While Ameriswiss is not seeking lost profits, the court notes that based on the evidence in the summary judgment record concerning the lack of identified customers for the D6s that Midway hauled, see Mot. Summ. J., Ex. 1, Luscher Dep. (doc. no. 41-4), at 138, any claim for such damages would be as unavailing as the lost-profits claim in Camar, see 221 F.3d at 277 ("In his deposition testimony, Camar's president, James Mercanti, admitted that Camar had no customer for the equipment at the time of the bid or at the time Preston lost the shipment.").

Midway hauled, the court turns to one final issue.  Ameriswiss has a duty to mitigate its losses.  See Paper Magic Grp., Inc. v. J.B. Hunt Transp., Inc., 318 F.3d 458, 463 (3d Cir. 2003) (citing M. Golodetz Export Corp. v. S/S Lake Anja, 751 F.2d 1103, 1112 (2d Cir. 1985)).  For that reason, and because Ameriswiss has retained the damaged machines, its losses are limited to the fair market value of those machines less their salvage value.  See Paper Magic, 318 F.3d at 465 (explaining that where shipper retains damaged goods, it is entitled to fair market value less salvage value, and where carrier retains such goods, shipper is entitled to full fair market value); Eastman Kodak Co. v. Trans Western Express, Ltd., 765 F. Supp. 1484, 1486 (D. Colo. 1991); see also B&D Appraisals v. Gaudette Mach. Movers, Inc., 733 F. Supp. 505, 508-09 (D.R.I. 1990) (ruling that jury committed no error in Carmack Amendment case by awarding damages based on fair market value of damaged machinery, reduced by net salvage value).

   Allowing Ameriswiss the full market value of its machines with no deduction for their salvage value, while it retains the machines, would give Ameriswiss a partial double recovery, cf. Paper Magic, 318 F.3d at 465, a result that is not permitted under the Carmack Amendment.  The Carmack Amendment allows a "shipper [to] recover 'all damages resulting from' the carrier's negligence."  Am. Nat'l Fire Ins. Co. ex rel. Tabacalera

9

Contreras Cigar Co. v. Yellow Freight Sys., Inc., 325 F.3d 924, 935 (7th Cir. 2003) (quoting Se. Express Co. v. Pastime Amus. Co., 299 U.S. 28, 29 (1936)). But, "the shipper cannot recover more than 'the injury suffered.'" American National, 325 F.3d at 935 (quoting Ill. Cent. R.R. Co. v. Crail, 281 U.S. 57, 63 (1930)). A shipper that recovers the full market value of its damaged goods from a carrier, while retaining the goods, and thus their salvage value, would recover more than the injury it suffered, in the amount of that salvage value.

At summary judgment, former defendant C.H. Robinson Worldwide, Inc. produced evidence that Ameriswiss had obtained information on the scrap value of its machines, but had no other information about their salvage value. See Mot. Summ. J., Ex. 1, Luscher Dep. (doc. no. 41-4), at 147-48. Before the court can determine the damages to which Ameriswiss is entitled, Ameriswiss must produce evidence of the salvage value of its damaged equipment.

**Conclusion**

For the reasons described above, Ameriswiss's motion for entry of judgment, document no. 59, is granted to the following extent: Ameriswiss is entitled to judgment against Midway in the amount of $44,800, less the salvage value of the damaged equipment. The court will enter final judgment against Midway

upon submission of evidence establishing the salvage value of the thirteen machines Midway damaged. The court concludes by noting that in the event Ameriswiss opts for a salvage value based on scrapping its machines, it would be well advised to produce competent evidence that it would not be able to make appreciably more money by engaging in some other form of salvage, such as selling undamaged components individually and selling as scrap only those pieces that are too badly damaged to be reused.

    SO ORDERED.

                                                                                                             _____
                                                                                                       Landya McCafferty
                                                                                                       United States Magistrate Judge

November 15, 2012

cc:   John F. Bisson, Esq.
       Wesley S. Chused, Esq.
       Fredric Paul Gallin, Esq.
       Mary K. Ganz, Esq.
       Frank J. Weiner, Esq.